## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM BIRD, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>DUN & BRADSTREET CORPORATION, THOMAS J. MANNING, JAMES N. FERNANDEZ, CINDY CHRISTY, L. GORDON CROVITZ, PAUL R. GARCIA, ANASTASSIA LAUTERBACH, RANDALL D. MOTT, and JUDITH A. REINSDORF,<br><br>Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff William Bird ("Plaintiff"), on behalf of himself and all others similarly situated, upon information and belief, including an examination and inquiry conducted by and through his counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for his Class Action Complaint:

### NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of himself and all other public stockholders of Dun & Bradstreet Corporation ("D&B" or the "Company") against D&B and the members of D&B's Board of Directors (the "Board" or the "Individual Defendants," and together with D&B, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which D&B will be acquired by an investor group led by CC

Capital Partners LLC ("CC Capital"), Bilcar, LLC ("Bilcar"), Cannae Holdings, Inc. ("Cannae") and funds affiliated with Thomas H. Lee Partners, L.P. ("THL") and certain other co-investors (collectively, the "Investor Group") (the "Proposed Transaction").

2.      On August 8, 2018, D&B issued a press release announcing it had entered into an Agreement and Plan of Merger dated August 8, 2018 (the "Merger Agreement") to sell D&B to the Investor Group for $145.00 per share in cash (the "Merger Consideration").  The Proposed Transaction is valued at approximately $6.9 billion, including the assumption of $1.5 billion of D&B's net debt and net pension obligations.

3.      On September 12, 2018, D&B filed a Preliminary Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC.  The Proxy Statement, which recommends that D&B stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) D&B insiders' potential conflicts of interest; (ii) D&B's financial projections prepared by D&B management and provided to and utilized by the Company's financial advisor J.P. Morgan Securities LLC ("J.P. Morgan") in connection with its evaluation of the Proposed Transaction; (iii) the valuation analyses prepared by J.P. Morgan in connection with the rendering of its fairness opinion; and (iv) the background of the sale process. The failure to adequately disclose such material information constitutes a violation of the above-referenced sections of the Exchange Act, as D&B stockholders need such information to cast a fully-informed vote or make an appraisal decision in connection with the Proposed Transaction.

4.      In short, unless remedied, D&B's public stockholders will be forced to make a voting or appraisal decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin

the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.      This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391 because: (i) the Company is headquartered in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; and (iii) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of D&B.

9.      Defendant D&B is a Delaware corporation with its principal executive offices located at 103 JFK Parkway, Short Hills, New Jersey.  The Company is the global leader in commercial data and analytics that gleans insight from data to enable its customers to connect with prospects, suppliers, clients and partners.  The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "DNB."

10.     Defendant Thomas J. Manning ("Manning") was appointed Chief Executive Officer ("CEO") on August 8, 2018, having previously served as Chairman of the Board & interim CEO since February 12, 2018.  Defendant Manning was previously appointed Lead Director of the Board in December 2016 and has served as a director of the Company since June 2013.

11.     Defendant James N. ("Fernandez") was appointed Chairman of the Board on August 8, 2018 and has been a director of the Company since December 2004.

12.     Defendant Cindy Christy ("Christy") has been a director of the Company since August 2015.

13.     Defendant L. Gordon Crovitz ("Crovitz") has been a director of the Company since July 2014.

14.     Defendant Paul R. Garcia ("Garcia") has been a director of the Company since May 2012.

15.     Defendant Anastassia Lauterbach ("Lauterbach") has been a director of the Company since August 2013.

16.     Defendant Randall D. Mott ("Mott") has been a director of the Company since June 2015.

17.     Defendant Judith A. Reinsdorf ("Reinsdorf") has been a director of the Company since June 2013.

18.     Defendants Manning, Fernandez, Christy, Crovitz, Garcia, Lauterbach, Mott, and Reinsdorf are collectively referred to herein as the "Board" or the "Individual Defendants," and together with D&B, "Defendants."

## OTHER RELEVANT ENTITIES

19.     CC Capital is a private investment firm founded in 2016 by Chinh Chu ("Chu"), with a focus on investing in and operating high-quality companies for the long term.

20.     Bilcar is a partnership owned by Bill and Carol Foley.  Bilcar's assets include various investments and business interests.

21.     Cannae is a diversified holding company with over $1 billion in book value in assets, investing in a diverse range of assets.

22.     THL is a private equity firm investing in growth companies, headquartered in North America, exclusively in four industry sectors: Business & Financial Services, Consumer & Retail, Healthcare, and Media, Information Services & Technology.

23.     Star Parent, L.P. ("Parent") is a Delaware limited partnership that is controlled by affiliates of CC Capital, Bilcar and THL.

24.     Star Merger Sub, Inc. ("Merger Sub") is a Delaware corporation and a wholly owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own D&B common stock (the "Class"). Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

26.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

27.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of August 31, 2018, there were approximately 37,130,398 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by D&B or

its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

28.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

29.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

31.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Outlook

32.     D&B is the world's leading source of commercial data, analytics and insight on businesses.  The Company's global commercial database as of December 31, 2017 contained more than 285 million business records. The Company transforms commercial data into valuable insight

which is the foundation of its global solutions that customers rely on to make critical business decisions.

33.    On May 9, 2018, the Company issued a press release announcing its first quarter 2018 financial results, including the following Company highlights:

- Revenue:
  - GAAP revenue of $418.2 million was up 10% year over year after the effect of foreign exchange (up 8% before the effect of foreign exchange). As previously announced, the Company adopted ASC 606 on January 1, 2018. The impact to first quarter revenue due to the adoption of ASC 606 was $33.5 million or 9% of year over year growth;

  - As Adjusted revenue of $384.7 million was flat year over year after the effect of foreign exchange (down 1% before the effect of foreign exchange). Organic revenue decreased 1% year over year.

- Operating Income:
  - GAAP operating income of $94.7 million compared to $41.3 million for the first quarter of 2017. The impact to first quarter operating income due to ASC 606 was $42.7 million;

  - As Adjusted operating income of $71.9 million was up 6% year over year.

- Diluted Earnings per Share ("EPS"):
  - GAAP diluted EPS of $1.71 compared to $0.42 for the first quarter of 2017. The impact due to ASC 606 was $0.88;

  - As Adjusted diluted EPS of $1.24 was up 31% year over year.

34.    Commenting on the results, Defendant Manning stated:

We made tremendous progress in the first quarter identifying opportunities to simplify the Company and to accelerate growth. With our unparalleled assets, large market opportunity, and engaged customer and employee base, I'm excited about the prospects for growth and value creation.

35.    Most recently, on August 8, 2018, the Company issued a press release announcing its second quarter 2018 financial results, including the following Company highlights:

- Revenue:

- GAAP revenue of $439.6 million, up 8% year over year both after and before the effect of foreign exchange.

- As Adjusted revenue of $394.4 million, down 3% year over year after the effect of foreign exchange (down 4% before the effect of foreign exchange).

- Organic revenue decreased 4% year over year. As previously mentioned, timing shifts related to several large contracts impacted growth by 3%.

- Operating Income:
  - GAAP operating income of $112.2 million, up 46% year over year.

  - As Adjusted operating income of $80.4 million, down 11% year over year. The decline in operating income was due to the timing shifts of several large contracts referenced above.

- Diluted Earnings per Share ("EPS"):
  - GAAP diluted EPS of $2.50 compared to $1.22 for the second quarter of 2017.

  - As Adjusted diluted EPS of $1.40, flat year over year.

**The Sale Process**

36.     During the fourth quarter of 2017 the Board authorized management to engage in confidential discussions and to share confidential information with financial sponsors and/or private equity firms interested in exploring a minority, non-controlling equity investment in D&B, commonly referred to as a private investment in public equity (or a "PIPE" transaction or investment).  The potential benefits of a PIPE investment, which the Board considered at the time, were a significant cash infusion to fund organic investments to enhance D&B's product offerings and technology platform and the addition of expertise and oversight from the PIPE investor, which investor would bring past experience with similar transformations, and who would also typically have the right to representation on the Board.  D&B entered into confidentiality agreements with, and disclosed confidential information about D&B to, four private equity firms, referred to in the Proxy Statement as "Financial Sponsor A," "Financial Sponsor B," "Financial Sponsor C" and

"Financial Sponsor D," and one additional private equity firm, which was controlled by a strategic operating company that had commercial ties with D&B and which firm was understood and permitted by D&B to work in tandem with Financial Sponsor A.

37.     On April 8, 2018, in response to receipt of an inquiry from a private equity firm referred to in the Proxy Statement as "Financial Sponsor E," D&B entered into a confidentiality agreement with Financial Sponsor E. Thereafter, D&B commenced discussions with, and provided confidential information to, Financial Sponsor E in connection with the exploration of a PIPE transaction with D&B.  The respective discussions with, and provision of confidential information to, Financial Sponsor C, Financial Sponsor D and Financial Sponsor E continued over the next three months, including presentations by management and access to a virtual data room.

38.     On April 17, 2018, Chu, senior managing director and founder of CC Capital, called a representative of J.P. Morgan.  Chu indicated that his firm was interested in pursuing an acquisition of D&B, and that CC Capital would be willing to pay between $140.00 and $145.00 in cash per share of D&B common stock to acquire all of the equity of D&B.

39.     On May 3, 2018, Defendant Manning met with Chu, with Chu indicating his belief he could secure the funding required for an acquisition of all of the equity of D&B at a price between $140.00 and $145.00 in cash per share of D&B common stock.  Defendant Manning informed Chu that the Company was not pursuing a sale at that time.

40.     On May 4, 2018, Chu contacted a representative of J.P. Morgan to reiterate CC Capital's interest in acquiring all of the equity of D&B at $140.00-$145.00 in cash per share of D&B common stock.  J.P. Morgan indicated that the Board had not determined to pursue a sale of D&B at that time and encouraged CC Capital to consider a proposal for a PIPE transaction. The following week, Chu reaffirmed to Defendant Manning that, while CC Capital would consider a

PIPE transaction, its focus was on a going-private transaction at a price of $145.00 in cash per share of D&B common stock.

41.    On May 7 and 8, 2018, the Board met and directed D&B management to work with J.P. Morgan on the continued pursuit of proposals for a PIPE transaction and for management simultaneously to pursue the implementation of recommendations for improvement to D&B's stand-alone plan.

42.    On May 29, 2018, D&B and CC Capital entered into a confidentiality agreement for the stated purpose of exploring a PIPE investment and D&B commenced sharing confidential information with CC Capital and its representatives, including by management presentations and access to the virtual data room.

43.    On June 13, 2018, J.P. Morgan, on behalf of the Board, sent a form of term sheet for a potential PIPE transaction to each of Financial Sponsor C, Financial Sponsor D, Financial Sponsor E and CC Capital, together with a request for each firm to submit a written response to such term sheet by July 9, 2018.

44.    On July 9, 2018, CC Capital submitted a written non-binding proposal to acquire D&B for $145.00 in cash per share of D&B common stock.  CC Capital's proposal stated that the firm was not interested in pursuing a PIPE proposal.

45.    On July 10, 2018, Financial Sponsor C submitted a markup of D&B's form of PIPE term sheet.  The markup did not specify the aggregate dollar amount of the investment, but described an investment by Financial Sponsor C in a newly authorized series of convertible preferred stock, not to exceed 19.9% of the shares of D&B common stock outstanding immediately before the issuance, having the following material terms: a perpetual term with a redemption right at the option of the investor commencing on the seventh anniversary of the issuance; a dividend

coupon of 6.0% per annum payable quarterly in arrears (paid in kind for the first 4 years and thereafter in cash or in kind at D&B's option); an initial conversion price reflecting a 5.0% premium to the unaffected volume weighted average price ("VWAP") of D&B common stock for the 20 trading days prior to announcement subject to adjustment that would benefit the investor in the event the trading price of D&B common stock decreases in the 5 trading days following announcement of the investment and the second quarter earnings release; a change-of-control put right of the investor that ratchets up to 2.0x the liquidation preference after the 18-month anniversary of the issuance; two Board seats and other Board and committee representation rights; veto rights over certain economic matters, as well as over the hiring and firing of any chief executive officer for the next two years, adoption of a poison pill, or entrance into any M&A transaction with a value in excess of $100,000,000.00; customary standstill restrictions on the investor; and other terms and conditions customary for transaction of this type.

46.    On July 11, 2018, Financial Sponsor D submitted a markup of D&B's form of proposed PIPE term sheet and proposed a target signing date of August 16, 2018.  The term sheet contemplated a $500,000,000.00 to $750,000,000.00 minority equity investment in the form of perpetual convertible preferred stock, not to exceed 19.9% of the shares of D&B common stock outstanding immediately before the issuance, having the following material terms: a perpetual term with a redemption right at the option of the investor commencing on the eighth anniversary of the issuance; a dividend coupon of 6.0% per annum payable quarterly in arrears, with 3.0% paid in cash and the remainder paid in cash or in kind at D&B's option; an initial conversion price reflecting a 15% premium to the VWAP of D&B common stock for the 30 trading days prior to announcement (which announcement would occur on a date after the announcement of D&B's second quarter earnings scheduled for August 9, 2018); two Board seats; limited veto rights over

certain economic and other matters; customary standstill restrictions on the investor; and other terms and conditions customary for transaction of this type.

47.     On July 16, 2018, the Board met and, among other things, discussed the PIPE term sheets received from Financial Sponsor C and Financial Sponsor D and the proposal to buy all of the equity of D&B from CC Capital, as well as the decision by CC Capital not to proceed with a proposal for a PIPE transaction.  The Board determined to review further financial analysis of the CC Capital proposal at a future meeting based on the forecasts, including following preparation by management of the "Risk-Adjusted High Probability Plan."

48.     On July 20, 2018, Financial Sponsor D submitted a revised proposal for a potential PIPE transaction.  The revisions included an option of the investor to cause redemption of the preferred shares upon the eighth anniversary of the issuance, a dividend rate of 5.5% per annum with 3.0% paid in cash and the remainder in cash or in kind at the option of D&B; and a conversion price that reflected a 15% premium to the 20 trading day VWAP preceding announcement of the investment (which Financial Sponsor D continued to contemplate occurring after August 9, 2018).

49.     On July 23, 2018, the Board met and representatives of CC Capital (including Chu), Financial Sponsor C and Financial Sponsor D each attended portions of the meeting and presented separately to the Board regarding their respective proposals and plans for D&B.  Following these discussions, J.P. Morgan presented preliminary financial analyses of D&B and the proposal by CC Capital, using four sets of prospective financial information for D&B: the "Risk-Adjusted High Probability Plan", the "Target Base Plan", the "Management 5-Year Plan" and the "Aspirational Plan" (collectively, the "Forecasts").

50.     On July 27, 2018, Financial Sponsor D informed J.P. Morgan that it was unwilling to execute definitive documentation for a PIPE transaction prior to D&B's next earnings release

on August 9, 2018, but that it could do so potentially within weeks thereafter if a transaction remained viable.

51.     On July 31, 2018, and August 1, 2018, Financial Sponsor C submitted successive iterations of a revised proposal for a PIPE transaction.  The final iteration contained an aggregate investment of up to $750,000,000.00; a right to redemption upon the seventh anniversary of the investment; dividends accruing at a rate of 6% per annum payable in cash or in kind at the option of D&B until the fourth anniversary of the investment and thereafter in kind; a conversion price at a premium of 5% to 10% over the lower of the VWAP for the 20 trading days before announcement of the investment and the VWAP for the five trading days after the announcement of the investment (which was contemplated as occurring on the same date as the second quarter earnings release by D&B scheduled for August 9, 2018); a change-of-control put right of the investor at a premium declining over time from 1.5x to 1.2x the liquidation preference; veto rights over M&A transactions with a value in excess of $250,000,000.00 and over which candidate the search committee of the Board would recommend to be the next CEO; and a right to appoint its representatives to occupy two Board seats, including the co-Chair of the Board.

52.     On August 2, 2018, Financial Sponsor C provided representatives of J.P. Morgan with a proposal to acquire all of the equity of D&B at $136.00 in cash per share of D&B common stock.

53.      On August 7, 2018, the Board met and received an update of J.P. Morgan's financial analyses of D&B and the merger, and discussed Financial Sponsor C's proposal to acquire all of the equity of D&B and the most recent PIPE proposals from Financial Sponsor C and Financial Sponsor D.  The Board discussed the financial impact on D&B's stockholders of the Investor Group proposal, including that once the merger agreement was executed, D&B would be

required to cease paying dividends other than the dividend that was approved by the Board on August 7, 2018. The Board authorized its advisors and management to continue negotiations with the Investor Group toward reaching a definitive agreement. Following this meeting, the parties completed their negotiation of the terms of the documentation for the merger.

54.    At an August 8, 2018 Board meeting, J.P. Morgan rendered its fairness opinion and the Board approved the Merger Agreement. Later that day, D&B and the Investor Group executed the Merger Agreement.

55.    On August 8, 2018, D&B issued a press release announcing the merger and the commencement of the go-shop period.

56.    On August 9, 2018, J.P. Morgan began the go-shop process by contacting 19 potential strategic bidders, 35 potential financial sponsor bidders (including Financial Sponsor A, Financial Sponsor B, Financial Sponsor C and a financial sponsor referred to in the Proxy Statement as "Financial Sponsor F") and one potential special-purpose acquisition company bidder about their potential interest in conducting due diligence of confidential information with a view toward potentially submitting a superior proposal. The special-purpose acquisition company inquired about a PIPE transaction and was told, on behalf of D&B, that discussions about a PIPE transaction were not permitted under the terms of the Merger Agreement. During the go-shop process, three third parties—two financial sponsors and one strategic company—signed confidentiality agreements with D&B and were provided access to the virtual data room, which included the Forecasts and presentations by management.

**The Proposed Transaction**

57.    On August 8, 2018, D&B issued a press release announcing the Proposed Transaction. The press release states, in relevant part:

SHORT HILLS, N.J. – August 8, 2018 – Dun & Bradstreet (NYSE:DNB) (the "Company"), the global leader in commercial data, analytics and insights for businesses, today announced that it has entered into a definitive merger agreement to be acquired by an investor group (the "Investor Group") led by CC Capital, Cannae Holdings and funds affiliated with Thomas H. Lee Partners, L.P. ("THL"), along with a group of other distinguished investors.

Under the terms of the agreement, which has been unanimously approved by Dun & Bradstreet's Board of Directors, Dun & Bradstreet shareholders will receive $145.00 in cash for each share of common stock they own, in a transaction valued at $6.9 billion including the assumption of $1.5 billion of Dun & Bradstreet's net debt and net pension obligations.

The purchase price represents a premium of approximately 30% over Dun & Bradstreet's closing share price of $111.63 on February 12, 2018, the last day of trading prior to Dun & Bradstreet's announcement of a strategic review and an indication of its willingness to consider all options for value creation.

Thomas J. Manning will lead the Company as Chief Executive Officer through the closing of the transaction. James N. Fernandez, a director of the Company since 2004 and Lead Director since February 2018, will serve as Chairman of the Board through the closing of the transaction.

"Today's announcement is the culmination of a thoughtful and comprehensive review of the value creation opportunities available to the Company as part of a full portfolio and business assessment and exploration of strategic alternatives with multiple financial sponsors. As a result of this process, the Dun & Bradstreet Board of Directors unanimously determined that this all-cash transaction with the Investor Group is in the best interest of our shareholders and our Company," said Mr. Manning.

Chinh Chu, Senior Managing Director and Founder of CC Capital, stated, "Dun & Bradstreet is a high-quality business with a 177-year history of serving its global customer base. We look forward to working with our partners and Dun & Bradstreet's talented team to unlock the immense potential within this venerable company."

William P. Foley II, Chairman of Cannae Holdings, said, "In an increasingly data-driven world, Dun & Bradstreet's insight-driven business model and interconnectivity across industries has positioned the Company for continued success. We are excited to grow the Company, increase operating efficiencies and improve the Dun & Bradstreet customer experience by providing enhanced business solutions."

Thomas Hagerty, a Managing Director at THL added, "We are honored to partner with an established leader in the commercial data and insight industry with a long history of excellence in helping customers and partners around the globe. As a

private company, Dun & Bradstreet will be well positioned to reinvigorate growth and create increased value for all stakeholders."

The transaction will be financed through a combination of committed equity financing provided by the Investor Group, as well as debt financing that has been committed to by BofA Merrill Lynch, Citigroup, and RBC Capital Markets.

**The Proxy Statement Contains Material Misstatements or Omissions**

58.    The Defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to D&B's stockholders.  The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction or seek to exercise their appraisal rights.

59.    Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) D&B insiders' potential conflicts of interest; (ii) D&B's financial projections prepared by D&B management and provided to and utilized by the Company's financial advisor J.P. Morgan in connection with its evaluation of the Proposed Transaction; (iii) the valuation analyses prepared by J.P. Morgan in connection with the rendering of its fairness opinion; and (iv) the background of the sale process.  Accordingly, D&B stockholders are being asked to vote for the Proposed Transaction or exercise their appraisal rights without all material information at their disposal.

*Material Omissions Concerning D&B Insiders' Potential Conflicts of Interest*

60.    The Proxy Statement fails to disclose material information concerning the potential conflicts of interest faced by D&B senior management and the Board.

61.    The Proxy Statement sets forth that:

As of the date of this proxy statement, no new employment, reinvestment, participation, equity contribution or other agreements, arrangements or

understandings between any executive officer or director, on the one hand, and D&B, Parent, Merger Sub or their respective affiliates, on the other hand, have been entered into (other than as described above). The merger is not conditioned upon any executive officer or director of D&B entering into any such agreement. Certain executive officers may enter into arrangements with D&B, Parent, Merger Sub or their respective affiliates following the date of this proxy statement that relate to employment or severance arrangements with, or the right to purchase or participate in the equity of, the surviving corporation or one or more of its affiliates. In addition, both prior to and subsequent to the execution of the merger agreement, Mr. Chu communicated to representatives of D&B that the Investor Group would be interested in having one or two of D&B's current directors (who have yet to be identified) continue to serve as directors of the surviving corporation after the effective time.

Proxy Statement at 70. The Proxy Statement, however, fails to set forth all of the discussions and negotiations concerning future employment, purchase of or participation in the equity of the surviving corporation, that occurred between the Investor Group and D&B's executive officers. The Proxy Statement further fails to disclose whether any of the Investor Group's proposals or indications of interest mentioned management retention or the potential for D&B executive officers to purchase or participate in the equity of the surviving corporation.

62.    Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

63.    The omission of this information renders the statements in the "Background of the Merger" and "New Management Arrangements" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning D&B's Financial Projections***

64.    The Proxy Statement is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

65.   First, the Proxy Statement omits material information regarding D&B's management's financial projections and the financial analyses performed by the Company's financial advisor J.P. Morgan based on these projections.

66.   For example, the Proxy Statement states that "J.P. Morgan conducted a discounted cash flow analysis for the purpose of determining an implied fully diluted equity value per share for D&B common stock. A discounted cash flow analysis is a method of evaluating an asset using estimates of the future unlevered free cash flows generated by the asset and taking into consideration the time value of money with respect to those cash flows by calculating their "present value." The "unlevered free cash flows" refers to a calculation of the future cash flows generated by an asset without including in such calculation any debt servicing costs. Specifically, unlevered free cash flow represents unlevered net operating profit after tax, adjusted for depreciation and amortization, net pensions and adjustments, tax affected total reengineering payments, capital expenditures and changes in net working capital." Proxy Statement at 60. The Proxy Statement fails, however, to disclose (i) unlevered net operating profit after tax; (ii) depreciation and amortization; (iii) tax affected total reengineering payments; (iv) capital expenditures; and (v) changes in net working capital, for the Company's "Risk-Adjusted High Probability Plan" utilized by J.P. Morgan in its analysis.

67.   Additionally, the Proxy Statement fails to disclose (i) unlevered free cash flow; (ii) depreciation and amortization; (iii) tax affected total reengineering payments; (iv) capital expenditures; and (v) changes in net working capital, for each of the Company's "Target Base Plan", "Management 5-Year Plan", and "Aspirational Plan."

68.   Moreover, the Proxy Statement sets forth:

The Target Base Plan, the Management 5-Year Plan and the Aspirational Plan were the result of several months of work by management, together with support from a

management consulting firm, that focused on mapping out potential initiatives to grow revenues and increase margins through new approaches to sales, product enhancements, technology improvements and cost savings. At the time of the adoption of the merger agreement, all of these initiatives were either still in the planning stages or in the early stages of commencement of implementation.

The Target Base Plan reflected the impact of cost savings arising from certain of these initiatives, which primarily consisted of investments in security improvements, network modernization, data supply chain consolidation, data center consolidation and disaster recovery.

The Management 5-Year Plan consisted of the Target Base Plan with the addition of a projected beneficial impact on revenues arising from an initiative for the hiring of a significant number of new personnel to engage in certain sales efforts directed at new customers.

The Aspirational Plan consisted of the Management 5-Year Plan with the addition of revenue enhancements based on increases in sales arising from additional growth initiatives.

Proxy Statement at 62. The Proxy Statement fails, however, to disclose (i) when the "Target Base Plan" , the "Management 5-year Plan" and the "Aspirational Plan" were created and any timeline for implementing the various initiatives; (ii) the specific growth initiatives contained in the "Management 5-Year Plan" and the "Aspirational Plan"; (iii) whether the initiative for the hiring of a significant number of new personnel to engage in certain sales efforts directed at new customers contained in the "Target Base Plan" had commenced; and (iv) any quantification of the assumptions, limitations and risks associated with the respective plans.

69.     The omission of this information renders the statements in the "Certain Unaudited Prospective Financial Information" and "Opinion of D&B's Financial Advisor" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning J.P. Morgan's Financial Analyses***

70.     The Proxy Statement describes J.P. Morgan's fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of J.P. Morgan's fairness opinion and analyses fails to include key inputs and assumptions underlying

these analyses.  Without this information, as described below, D&B's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on J.P. Morgan's fairness opinion in determining whether to vote in favor of the Proposed Transaction or seek to exercise their appraisal rights.  This omitted information, if disclosed, would significantly alter the total mix of information available to D&B's stockholders.

71.    With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose (i) the Company's net debt and minority interest as of June 30, 2018; (ii) estimated after-tax pension underfunding; (iii) quantification of the inputs used to derive the discount rate range of 8.25% to 8.75%; and (iv) the implied terminal multiples resulting from the analysis.

72.    Without such undisclosed information, D&B stockholders cannot evaluate for themselves whether the financial analyses performed by J.P. Morgan were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which J.P. Morgan's opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction or seek to exercise their appraisal rights.

73.    The omission of this information renders the statements in the "Opinion of D&B's Financial Advisor" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background of the Sale Process***

74.    The Proxy Statement is materially deficient because it fails to disclose material information relating to the background of the sale process.

75.    The Proxy Statement fails to disclose the implied per share value indications for the Company on a standalone basis based on the Forecasts as presented to the Board by J.P. Morgan at the July 23, 2018 Board meeting.

76.    The Proxy Statement further fails to disclose the Board's decision making process in agreeing to foreclose discussions about a PIPE transaction during the go-shop period, under the terms of the Merger Agreement.

77.    The omission of this information renders the statements in the "Background of the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

78.    The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction or exercise their appraisal rights and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants for Violations of Section 14(a) of the
Exchange Act and Rule 14a-9 Promulgated Thereunder**

79.    Plaintiff repeats all previous allegations as if set forth in full.

80.    During the relevant period, Defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the

statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

81.     By virtue of their positions within the Company, the Defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the Defendants.  It misrepresented and/or omitted material facts, including material information about Company insiders' potential conflicts of interest, the financial analyses performed by the Company's financial advisor, the actual intrinsic standalone value of the Company, and the background process leading to the Proposed Transaction.  The Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

82.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction or whether to seek to exercise their appraisal rights.

83.     By reason of the foregoing, the Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

84.     Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

85.     Plaintiff repeats all previous allegations as if set forth in full.

86.     The Individual Defendants acted as controlling persons of D&B within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of D&B, and participation in and/or awareness of the Company's operations

and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

87.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy Statement.

89.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

90.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

91.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their

positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' conduct, D&B's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of D&B, and against Defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to D&B stockholders;

C.     In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.     Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  September 25, 2018

By  *s/Aaron Rubin*
　　　　　　　　　　　　　　　　　　　　

**RUBIN & MENDLOWITZ, LLC**
Aaron Rubin
2623 Hooper Avenue
Brick, New Jersey 08723
Tel: (516) 590-0544
Fax: (516) 506-0832

*Attorneys for Plaintiff*

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly Keenan Moran
Alexandra E. Eisig
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

*Attorneys for Plaintiff*